IN THE COURT OF APPEALS OF TENNESSEE

EASTERN SECTION

FILED

July 9, 1996

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| SCOTT McCLUEN | ) | ROANE COUNTY |
| | ) | 03A01-9512-CV-00434 |
| Plaintiff-Appellant | ) | |
| | ) | |
| | ) | |
| v. | ) | HON. JOHN B. HAGLER, |
| | ) | JUDGE |
| | ) | (Sitting by Interchange) |
| THE ROANE COUNTY TIMES, INC., | ) | |
| d/b/a THE STANDARD, and | ) | |
| GERALD LARGEN | ) | |
| | ) | |
| Defendants-Appellees | ) | AFFIRMED AND REMANDED |

JOHN D. KITCH OF NASHVILLE and GEORGE ALLEN OF GOODLETTSVILLE FOR APPELLANT

GERALD LARGEN OF KINGSTON FOR APPELLEES

O P I N I O N

Goddard, P.J.

This is a suit by Scott McCluen, County Attorney for Roane County, against The Roane County Times, Inc., d/b/a The Standard, and its owner and publisher Gerald Largen, seeking damages for libel incident to two separate publications in The Standard.

The Trial Court directed a verdict in favor of the Defendants at the conclusion of the Plaintiff's proof because Mr. McCluen had not shown that Mr. Largen maliciously published the material.

Mr. McCluen appeals, insisting that the Trial Court was in error.

By way of background, it appears that previous to the publication of the articles in question, Mr. Largen was instrumental in securing the termination of Mr. McCluen's father as Chairman of the Harriman Hospital Board and that Mr. McCluen had brought to the attention of the County Commission in its July 12, 1993, meeting that Mr. Largen's law office equipment had been removed from the tax rolls, although he was continuing in the practice of law. It also appears that Mr. Largen took exception to Roane County's issuance of $15,000,000 in bonds for improvement of schools without a referendum when an earlier $20,000,000 bond issue, which included consolidation of certain schools, had been defeated by referendum.

Two separate acts--one by the County and one by Mr. McCluen--prompted the publication of the articles sued upon. In 1988 the County entered into a contract with International Metals Company (IMCO), whereby IMCO was given a reduced rate for its use of a solid waste sanitary landfill operated by the County. Part of the consideration for the reduced rate was the

2

transfer of 100 acres owned by IMCO to the County. Subsequently and after the County Budget Director pointed out that the rate paid by IMCO was considerably less than cost of receiving and processing its refuge, the County and IMCO entered into a second contract which purported to rescind the first and, <u>inter</u> <u>alia</u>, for the County to return to IMCO approximately one-half of the real estate previously transferred.

The other act prompting the article was Mr. McCluen's report to the Commission with regard to Mr. Largen's tax status hereinbefore noted.

The portions of articles in question as set out in the complaint are as follows:

<u>July 14, 1993</u>

Editorial Comments/Letters--The Truth Hurts

"How else to explain why this group of men and one woman, who were elected to look after the county's business and protect its interests, would, at a meeting the primary business of which is, under the statutes, to pass a budget and set a tax rate, instead devote much of their meeting not to their and the people's proper concerns, but rather to a harangue attacking the publisher of this paper for telling the truth about them and their deal with IMCO?"

"Nowhere, however, in all his bleating and breast-beating does he point out a single untruth or a single misstatement of fact; this for the reason that our article was true, as he well knew."

"And all his braggadocio swagger and bluster about suing us is blather, as we could demonstrate point by point, but it is our policy never to engage in battle

3

of wits [sic] with an unarmed man." (Bracketed word in complaint.)

"It is, however, disturbing to find that our county attorney and six of our commissioners have nothing better to do than to try to intimidate a citizen by having the tax assessor investigate him, with the implied threat that his taxes ought to be raised because he has told the truth about them."

"This sound like the days of the Nixon White House and the attempted use of the IRS to intimidate those on his 'enemies list.'"

"It is probably no coincidence that the leaders of the 'gang of six' were the same ones who spear-headed the effort to ignore and abrogate the will of the people as expressed in a referendum against the 20 plus million dollar bond issue, and who did in fact put the people in 'bondage' for some 14 million dollars, against the people's wishes."

"However, we will continue to tell the truth on Mr. McCluen and his 'gang of six' and they may rest assured, we will not be silenced, we will not be intimidated, and we will not be frightened by such will-of-the-wisps as these seven."


July 21, 1993

The IMCO--Chapter 2--Do We Still Own Our Land?

"We think that, had Mr. McCluen consulted with a lawyer, he would have discovered that one of the rudimentary equitable principles applied to a rescission is that both parties to a rescission must have restored to them the things they or rights they gave up as consideration for the original contract."

"Therefore, it is obvious that there has been no rescission. There has been another 'sweet-heart' deal at the expense of the taxpayers and the other users of the landfill."

"The graver issue, however, is what are the implications for those 'county governing entities and county officials' referred to by the Supreme Court, who have not abided by the law.[sic]" (Bracketed word in complaint.)

"Does such violation warrant criminal sanctions? If so, would it be a felony or a misdemeanor?"

4

"Is such violation grounds for recovery against the officials and their bondsmen?"

"Would violation of the requirements of this law justify ouster of the violators?"

Subsequent to the July 21 publication, Mr. McCluen's counsel notified the Defendants by letter that materials contained in both publications were false and defamatory and requested a retraction pursuant to T.C.A. 29-24-103. No retraction was forthcoming, although the August 4, 1993, issue of the paper published the request for a retraction in full. (See appendix.)

At the conclusion of the Plaintiff's proof the Trial Court, as already noted, directed a verdict in favor of the Defendants "based upon the Court's finding that actual malice had not been proved."

At the outset, it is conceded that Mr. McCluen is a public official and, as such, he must show that the articles were untrue and published with malice. Under our Supreme Court case law, malice in the context of libel actions is not personal ill-will toward a party, Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 111 S.Ct. 2419 (1991), but rather knowledge that the statement published is false or a reckless disregard of whether it is false or not.

5

This rule was enunciated by our Supreme Court in <u>Press, Inc. v. Verran</u>, 569 S.W.2d 435, 437 (Tenn. 1978), which follows the dictates of the Supreme Court of the United States set out in <u>New York Times Co. v. Sullivan</u>, with regard to malice and then adopted the standard enunciation in the Restatement (Second) of Torts:

An analysis of the issues involved in this controversy must start with the landmark case of <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), wherein the Supreme Court, considering the case "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open," fashioned a new rule of "constitutional privilege":

The constitutional guarantees require, we think, a federal rule that prohibits a <u>public official</u> from recovering damages for a defamatory falsehood relating to his <u>official conduct</u> unless he proves that the statement was made with "actual malice"-- that is, with knowledge that it was false or with reckless disregard of whether it was false or not. (Emphasis supplied). 376 U.S. at 279-280, 84 S.Ct. at 726, 11 L.Ed.2d at 706.

. . . .

We are impressed with Standards 580A and 580B, Restatement (Second) of Torts (1977). They read as follows:

§580A. <u>Defamation of Public Official or Public Figure</u>. One who publishes a false and defamatory communication concerning a public official or public figure in regard to his conduct, fitness or role in that capacity is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other person, or
(b) acts in reckless disregard of these matters.

§580B. <u>Defamation of Private Person</u>. One who publishes a false and defamatory communication concerning a private person, or concerning a public

6

official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other,
(b) acts in reckless disregard of these matters, or
(c) acts negligently in failing to ascertain them.

We believe that these standards meet the criteria of our federal and state constitutions and we adopt them as the law of this jurisdiction.

Moreover, to sustain such an action, malice must be shown by "convincing clarity." New York Times Co. v. Sullivan, supra.

In reviewing the propriety of the Trial Court's directing a verdict in this case, we must determine upon taking the evidence in the light most favorable to Mr. McCluen and indulging all reasonable inferences in his favor whether reasonable minds must agree that malice as defined in the context of libel suits against public officials has not been shown. Goode v. Tamko Asphalt Products, Inc., 783 S.W.2d 184 (Tenn. 1989); Wharton Transport Corp. v. Bridges, 606 S.W.2d 521 (Tenn. 1980).

As to the first article, except for hyperbole, exaggeration and opinion, in the characterization of Mr. McCluen's presentation to the Commission, we find only one misstatement of fact. This is found in the second paragraph

stating that Mr. McCluen did not "point out a single untruth or single misstatement of fact." As to this quotation, the undisputed proof is that Mr. Largen believed that what he was writing was true, as he believed the facts he stated in his previous article regarding the landfill were true, but even if he did not, we cannot find that the statement above quoted could, as a matter of law in the context used, be considered libelous.

In the second article, the only misstatement of fact we find is the implication that Mr. McCluen had not consulted with a lawyer. The proof shows that he did speak with the County Executive who was a lawyer, but had not practiced law since assuming office some 12 years before the hearing. There is no proof that Mr. Largen knew the implication made in his statement was false, and, as we have said with regard to the misstatement in the first article, we do not believe the statement in the context used is libelous.

The only other language we deem it necessary to address in the articles are the questions found at the conclusion of the second publication. These, of course, are not statements of fact, but questions put to the public which clearly indicate by the use of the words "If so" in the second question that the answer to the first question may be "no." We recognize that under certain circumstances questions could be libelous. However, we do not believe as posed these can.

8

A helpful annotation is found on the subject of defamation by questions in 53 A.L.R. 4th, at page 450. The lead case as to that subject is Schupmann v. Empire Fire & Marine Ins. Co., 689 S.W.2d 101 (Mo. App. 1985), wherein the Court of Appeals of Missouri stated the following:

> Defendant's agent in the course of investigating an insurance claim concerning plaintiff's mother asked appellant's neighbor, "Was pregnancy the reason for [the minor] going there [to a hospital]?" This is not an assertion of a fact but rather a question. It invites an answer of "yes," "no" or "I don't know." Since there is no implication that the questioner believed the minor was pregnant this case can be distinguished from Hunt v. Gerlemann, 581 S.W.2d 913 (Mo. App. 1979) where the insured asked the plaintiff "How did you set the fire?"

The questions in the case at bar, like those in Schupmann, invite the answer of "yes," "no," or "I don't know."

It would seem to us that if in fact the declaratory statements preceding the questions are not libelous, and the questions are not equivalent to a direct charge that would be libelous, a suit therefor may not be maintained.

Examples of questions contained in the annotation which are actionable include, "What are you doing with that nine-dollar blackmailer here?", Hess v. Sparks, 24 P. 979 (Kan. 1890); "Ward [plaintiff's husband] has sold half of his wife to Legeyt, hasn't he?", Ward v. Merriam, 78 N.E. 745 (Mass. 1906); "Don't you want to pay for those cartridges you stole?", Malone v. Montgomery

9

Ward & Co., 38 F. Supp. 369 (S.D.Miss.1941);   "What are you doing stealing that electric light bulb?", McDonald v. F. W. Woolworth Co., 135 S.W.2d 359 (Mo.Ct.App.1939).

As already noted, under the record developed there is no proof that Mr. Largen in fact knew that the factual matters complained of were false, or that there was a high degree of probability that they were false.  Thus, the Trial Court acted properly unless it could be said Mr. Largen acted recklessly in printing the articles.

It is true that in the same edition the first offending material appeared under the heading "Editorial," a reporter for the Standard wrote a news article regarding the meeting which contradicted in part the material contained in the editorial and that Mr. Largen made no effort to contact the reporter or Mr. McCluen prior to publishing his articles.  However, in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997 (1974), the Supreme Court of the United States held that:

> "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth. Rather, the publisher must act with a 'high degree of awareness of . . . probable falsity.'" St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

In conclusion, we recognize that certain statements made in the articles,[1] such as the aforementioned

---

[1]    (1) "harangue," (2) "bleating and breast beating," (3) braggadocio, swagger and bluster," (4) "blather," (5) "Nixon Whitehouse," (6) "gang of six" (it is clear that this reference did not include Mr. McCluen), (7) "Will-O'-the-Wisp," (8) "Sweetheart deal."

characterization of Mr. McCluen's report to the County Commission, were made by Mr. Largen without any information as to Mr. McCluen's demeanor when reporting. However, we do not believe this characterization would be actionable, but instead-- as are other characterizations in the articles--permissible hyperbole, such as those documented by Judge Conner in Stones River Motors, Inc. v. Mid-South Publishing Co., 651 S.W.2d 713, 722 (Tenn. App. 1983), wherein he lists a number of similar statements which were held not to give rise to a cause of action:

> The comments and characterizations involved here, such as "pure highway robbery" and "rip-off," fit precisely the rationale of Greenbelt, Old Dominion and § 566 of the Restatement. These are clearly characterizations of the facts set forth in the letter, and do not imply the existence of undisclosed defamatory facts. Thus, these authorities are controlling. See also Orr v. Argus-Press Co., 586 F.2d 1108 (6th Cir. 1978) (use of the word "swindle" to characterize the plaintiff's violation of Michigan's Blue Sky law, while "ill chosen" held not actionable); Fram v. Yellow Cab Co. of Pittsburgh, 380 F. Supp. 1314, 1329 (W.D. Pa. 1974) (statement that the plaintiff's previous statements reflect "the sort of paranoid thinking that you get from a schizophrenic" held not actionable, because it would be understood as mere "rhetorical hyperbole"); Reoux v. Glenn Falls Post Co., 18 Misc. 2d 1097, 190 N.Y.S. 2d 598, 600-01 (N.Y. Sup. Ct. 1959) (statement that plaintiff's refusal to tell a court the whereabouts of certain money was "contumacious conduct" was not actionable, because it simply expressed an opinion that the plaintiff was "stubborn or contrary or obstinate or disobedient." Schy v. Hearst Pub. Co., 205 F.2d 750 (7th Cir. 1953) (charging the plaintiffs with "gestapo-like" tactics not actionable, because it was merely "a somewhat rhetorical way of saying that their conduct was dictatorial"); Bleecker v. Drury, 149 F.2d 770 (2nd Cir. 1945) (statement that a lawyer had committed "a fraud upon the court" was merely a "bombastic characterization of the plaintiff's maneuvers" in representing his client, and was not actionable as libel); Williams v. Rutherford Freight Lines, Inc., 10 N.C. App. 384, 179 S.E. 2d 319, 323 (1971) (statement in

11

the course of a labor dispute that the plaintiffs were "gangsters" is "nothing more than vituperation or name calling" and is not actionable); Heft v. Burk, 302 So.2d 59, 60 (La.App.1974) (statement that the plaintiff was "pirating" employees away from the defendant and that his actions were "totally unethical" merely expressed the defendant's strong opinion concerning the plaintiff's attempts to hire employees away from him, and were not actionable); Brown v. Newman, 224 Tenn. 297, 454 S.W.2d 120 (1970) (statement "have the skids been greased at city council?" not actionable).

In summary, we find that under the standard of review we must employ, some false statements were made in the publications. We further find under the same standard of review that they were non-malicious. Moreover, we also find that they were also either non-libelous or permissible hyperbole.

For the foregoing reasons the judgment of the Trial Court is affirmed and the cause remanded for collection of costs below. Costs of appeal are adjudged against Mr. McCluen and his sureties.

_____
Houston M. Goddard, P.J.

CONCUR:

_____
Herschel P. Franks, J.

_____
Charles D. Susano, Jr., J.

12